IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Charles E. Boussum,                          :

              Plaintiff,               :          Civil Action 2:08-cv-00770

    v.                                      :          Judge Smith

Terry Collins, *et al.*,                      :          Magistrate Judge Abel

          Defendants.              :


## OPINION AND ORDER

Plaintiff Charles E. Boussum, an inmate at the Chillicothe Correctional Institution, brought this prisoner civil rights action under 42 U.S.C. §1983, alleging that defendants have retroactively applied parole guidelines to him that have significantly increased his risk of incarceration.  This matter is now before the Court on Plaintiff's August 11, 2010 objections (Doc. 69) to Magistrate Judge Mark R. Abel's July 27, 2010 Report and Recommendation (Doc. 65) that Defendants' September 30, 2010 motion for summary judgment (Doc. 45) be granted.

A.    **Factual Background**

In 1987 and 1988, Plaintiff was convicted of three counts of gross sexual imposition, one count of illegal use of a minor in nudity-oriented material or performance, and thirteen counts of rape.  The three crime victims were all under the age of thirteen.  Plaintiff was sentenced, for the rapes, to terms of five to twenty-five years per count.  The sentences were placed into three concurrent

groups, one for each victim, and the groups were to run consecutively.

In 1995, Ohio adopted a new sentencing system ("Senate Bill 2"), effective July 1, 1996, which abandoned indeterminate sentences in favor of fixed terms of incarceration.  In 1998, the Ohio Adult Parole Authority ("OAPA") adopted guidelines (the "1998 Guidelines") intended to guide the discretion of parole officers making release determinations for prisoners sentenced prior to July 1, 1996.  It determined a presumptive length of sentence by the intersection of factors of seriousness of offense and risk of reoffense on a grid or matrix.  Parole officials retained their discretion to depart from these guidelines.  In 2007, the OAPA established another set of parole guidelines (the "2007 Guidelines").  It maintained the use of the matrix, but only as a starting point for the parole board's decision-making process, rather than an indication of what was a reasonable sentence.  It also categorized offenders into numerical categories, such as Category 9 for a prisoner convicted of voluntary manslaughter.  The 2007 Guidelines assigned an offender to Category 11 if he had been convicted of more than one count of rape involving more than one victim under the age of 16.  They also contained a point-based scheme for increasing an offender's category if he had committed multiple crimes.[1]

In May 2008, Boussum was denied parole.  He then brought suit arguing

---

[1]  The parties concur that the OAPA later rescinded the 2007 Guidelines, although Plaintiff argues that they were nevertheless applied to him during his 2008 hearing.

that the OAPA had retroactively applied the Senate Bill 2 standards in his parole hearing, that it had retroactively applied the new "multiple separate offenses" rule from the 2007 Guidelines, and that the retroactive application of "victim's rights" laws and regulations passed subsequent to his sentence created a significant risk of prolonging his incarceration.

## B.  Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993).  To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th  Cir. 1993).  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the evidence must be viewed

3

in the light most favorable to the nonmoving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (concluding that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility determinations or weighing evidence).  In responding to a motion for summary judgment, however, the nonmoving party "may not rest upon its mere allegations [...] but [...] must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Celotex*, 477 U.S. at 324.  Furthermore, the existence of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party.  *Anderson*, 477 U.S. at 251; *see Matsushita*, 475 U.S. at 587-88 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment).

## C.    Ex Post Facto Clause and Parole

Prisoners who challenge the application of parole guidelines

can establish an ex post facto violation if they can show that the guidelines, on their face, show a significant risk of increased incarceration.  Second, when the guidelines do not by their own terms show a significant risk, plaintiffs "must demonstrate, by evidence drawn from the [guidelines'] practical implementation by the agency charged with exercising discretion, that its application will result in a longer period of incarceration than under the earlier [guidelines]."

*Michael v. Ghee*, 498 F.3d 372, 384 (6th Cir. 2007), quoting *Garner v. Jones*, 529 U.S. 244, 255 (2000).  However, the "focus of the *ex post facto* inquiry is not on whether a legislative change produces some ambiguous sort of 'disadvantage',... but

on whether [the] change... increases the penalty by which a crime is punishable."
*Cal. Dep't of Corr. v. Morales*, 514 U.S. 499, 506 n.3 (1995).

In *Foster v. Booker*, 595 F.3d 353 (6th Cir. 2010), the Sixth Circuit Court of Appeals recently addressed an *ex post facto* challenge to Michigan's parole system. The state of Michigan has long operated a discretionary parole system. However, legislative changes in 1992 and 1999 effected a change to the structure and composition of Michigan's parole board, as well as to its parole procedures. A group of inmate plaintiffs brought suit against the Michigan Parole Board, claiming that these changes showed both on their face and in their implementation a significant risk of increased incarceration giving rise to an ex post facto claim. The *Foster* court, however, found the fact that Michigan's parole system was discretionary dispositive:

> To the extent that plaintiffs have shown they face a significant risk of increased punishment under the new parole regime, plaintiffs have not shown that this risk is attributable to statutory changes in the parole process and not to a change in the way the Board legitimately exercises its discretion. Therefore, from the time plaintiffs committed their offenses, there was always the possibility the Board would exercise its discretion in a way that would result in fewer paroles and longer prison terms...

> If the Parole Board decided within its discretion to get tougher, that could hardly amount to an ex post facto violation as long as it was within the Parole Board's discretion to get tougher. This would be true even if the tougher attitude resulted from a change in personnel on the Board, even if the Board members independently developed a tougher attitude, and even if the Board members partook of a general public attitude that parole decisions should be tougher.

*Id.* at 362 (citations omitted).

5

Plaintiff argues that Ohio's parole system is not completely discretionary, because its discretion has been limited by regulations enacted after he was sentenced.  He cites O.A.C. §5120:1-1-07(B), which provides:

In considering the release of the inmate, the parole board shall consider the following:

(1) Any reports prepared by any institutional staff member relating to the inmate's personality, social history, and adjustment to institutional programs and assignments;

(2) Any official report of the inmate's prior criminal record, including a report or record of earlier probation or parole;

(3) Any presentence or postsentence report;

(4) Any recommendations regarding the inmate's release made at the time of sentencing or at any time thereafter by the sentencing judge, presiding judge, prosecuting attorney, or defense counsel and any information received from a victim or a victim's representative;

(5) Any reports of physical, mental or psychiatric examination of the inmate;

(6) Such other relevant written information concerning the inmate as may be reasonably available, except that no document related to the filing of a grievance under rule 5120-9-31 of the Administrative Code shall be considered;

(7) Written or oral statements by the inmate, other than grievances filed under rule 5120-9-31 of the Administrative Code.

(8) The equivalent sentence range under Senate Bill 2, (effective July 1, 1996,) for the same offense of conviction if applicable.

(9) The inmate's ability and readiness to assume obligations and undertake responsibilities, as well as the inmate's own goals and needs;

(10) The inmate's family status, including whether his relatives display an interest in him or whether he has other close and constructive association in the

6

(11) The type of residence, neighborhood, or community in which the inmate plans to live;

(12) The inmate's employment history and his occupational skills;

(13) The inmate's vocational, educational, and other training;

(14) The adequacy of the inmate's plan or prospects on release;

(15) The availability of community resources to assist the inmate;

(16) The physical and mental health of the inmate as they reflect upon the inmate's ability to perform his plan of release;

(17) The presence of outstanding detainers against the inmate;

(18) Any other factors which the board determines to be relevant, except for documents related to the filing of a grievance under rule 5120-9-31 of the Administrative Code.

Plaintiff points to the mandate that "the parole board shall consider the following" and the inclusion of the equivalent sentence range under the new, tougher Senate Bill 2 standard at (B)(8), arguing that this regulation required the board at his 2008 hearing to consider the new, tougher sentencing standard. However, as the Magistrate Judge found, there is no evidence to suggest that it actually did. The Ohio Parole Board, in its decision of May 22, 2008, expressly identified its reasons for denying parole:

> This case is aggravated by the convictions for many sex offenses involving multiple victims. Including photographs, and sadistic physical abuse. Inmate has no criminal history, has completed some programming, and has good institutional conduct. However, aggravating factors in this case warrant a lengthy continuance. After weighing relevant factors, COBR does not consider the inmate suitable for release, and continues inmate 10 years from the end of the last continuance.

7

(Doc. 47 at 64-65.)  Moreover, Roy F. Rauschenberg, a member of the parole board which sat at this hearing, testified in an affidavit that although this regulation "does not explicitly state that OAPA shall not consider the Senate Bill 2 equivalent sentence length in cases such as inmate Boussum's, as a matter of practice and routine, OAPA does not consider it in cases such as inmate Boussum's."  (Doc. 51-1 at 2.)  He also confirmed that the written decision accurately reflected the grounds upon which the board had denied parole.  (*Id.* at 1.)

The Parole Board's statement that it made its decision "[a]fter weighing relevant factors", Plaintiff states, is evidence that the board must have been compelled to take into account (B)(8) as one of the mandatory "relevant factors".  He argues that this amounts to a limit upon the Parole Board's discretion, bringing it out of the ambit of *Foster*.  This argument is not colorable.  The Parole Board's decision stated its reasoning.  Rauschenberg reiterated what the Parole Board's reasoning had been, and stated further that the Board as a matter of practice did not retroactively apply Senate Bill 2 standards to pre-enactment inmates such as Plaintiff.  O.A.C. §5120:1-1-07(B) contains numerous other factors which might or might not be applicable to certain inmates up for parole; *see, e.g.*, (B)(1) (reports about inmate prepared by institutional staff member);  (B)(6) (other relevant written information concerning inmate); (B)(17) (presence of outstanding detainers).  The Parole Board, as Rauschenberg stated, did not apply (B)(8), because it was not applicable to Plaintiff.  An assertion that the Board's deliberations must somehow have been tainted by a regulatory mandate to consider

8

a standard not applicable to Plaintiff is specious.

Plaintiff also argues that the Parole Board retroactively applied to him an offense categorization scheme from the 2007 Guidelines.  The May 2008 decision stated that Plaintiff's convictions were in "Category 11", which is defined at §231(B) of the 2007 Guidelines as applicable "if the inmate is convicted of more than one count of rape involving more than one victim under the age of 16."  Furthermore, the 2007 Guidelines instituted a point-based scheme where multiple separate offenses would be aggregated together to determine whether, taken together, they should place the inmate into a higher offense category.  Once again, however, there is no evidence, or even plausible reason to believe, that the Parole Board followed or was compelled to follow the 2007 Guidelines' offense category or "multiple separate offenses" scheme in making its decision, rather than the reasons which it set forth and about which Rauschenberg testified.[2]

Plaintiff has, in short, made no showing that the Senate Bill 2 requirements or 2007 Guidelines, on their face, show a significant risk of increased incarceration, because he cannot show that Senate Bill 2 or the 2007 Guidelines affected in any

---

[2] There is, in particular, reason to think that the Parole Board did *not* follow the "multiple separate offenses" recommendation scheme.  Plaintiff was convicted of thirteen counts of rape.  (Doc. 57-1 at 1-13.)  Had the Parole Board applied the point-based scheme to Plaintiff, it would have indicated on Plaintiff's form that he was in Category 13.  Plaintiff has repeatedly, in defiance of the indictments and sentence entries in his case, insisted that he was charged with only three counts of rape.  *See, e.g.*, Doc. 69 at 11-12.  However, even if the Parole Board had considered Plaintiff to have been sentenced for three counts of rape, it would have indicated that he was in Category 12.  For Plaintiff's indictments and judgment entries of sentence, *see* Doc. 57-1.

way the Board's discretionary decision to deny him parole.  Despite his arguments that different rules must have been retroactively applied to him, there exists no legal question as to whether the Ohio Parole Board retained its discretion to make parole determinations, or genuine issue of material fact as to whether it exercised that discretion.  Like the Michigan Parole Board in *Foster*, the Ohio Parole Board had the power and discretion to determine that, due to the serious nature of Plaintiff's crimes, he was not suitable for release on parole.  And where it possessed that discretion, no *ex post facto* violation existed in its exercise.  The Parole Board was not compelled to, and did not, retroactively apply any statute, regulations, or new guidelines which on their face would create a sufficient risk of increasing the measure of punishment for Plaintiff's crimes.

In addition, Plaintiff argues that practical implementation of the new rules has resulted in a longer term of incarceration for him than would have been the case had the Parole Board continued to apply the same standards that were in place when he was originally sentenced:

> The 2007 parole guidelines' "multiple separate offense" enhancement, coupled with the consecutive sentence requirement in O.R.C. §2967.13 and the Senate Bill 2 sentence standard in O.A.C. §5120:1-1-07(B)(8), have changed what would have been an actual incarceration of 18 years and 4 months in 1987 into a longer period of incarceration of 54 years.  In order to prove this fact, Plaintiff must have access to his parole file, authenticated parole statistics from 1987 and 1988 up to and including 2008, and the 2007 parole guidelines – even though the 2007 parole guidelines have since been rescinded, the harm caused has not been cured by the rescission.

(Doc. 69 at 13-14 (citations omitted).)  He originally stated this argument, more

10

specifically, in his memorandum contra summary judgment:

> The average time served standard for a Rape conviction in 1987 for
> male offenders was 6.11 years.  When the figure of 6.11 years is
> multiplied times three (3) – the number of Plaintiff's Rape offenses –
> the average time served standard for 1987 is 18.33 years, or 18 years
> and four (4) months.  Compare this figure to the current average time
> served standard of 18 years times three (3), and the current average
> time served standard that was applied to Plaintiff in 2008 is fifty-four
> (54) years.

(Doc. 47 at 5, citations omitted.)  In his objections, he argues again that he requires

discovery in order to be able to support and prove his theory that there has been an

*ex post facto* effect of extending his time served to much longer than was typical for

an offender in 1987.  He attached to his memorandum contra statistical data from

1987 for the average time served for inmates by crime.[3]  (Doc. 47 at 55.)  The table

he cites states, for rape, that the average person sent to the state penitentiary for

the crime of rape had an actual time served of 6.11 years.  This is the basis of

Plaintiff's argument that, since a person convicted in 1987 served 6.11 years per

rape, Plaintiff should have served 18.33 years.  Plaintiff attached also what he

presents as the equivalent statistical data for 2007, which he states shows that the

average person sent to the state penitentiary for the crime of rape had an actual

time served of 18 years.  (*Id.* at 57.)

Plaintiff has, however, done nothing in his objections to overcome the

Magistrate Judge's findings that:

---

[3] Defendants have challenged these statistical exhibits as not admissible.
(Doc. 49.)

11

In the first place, Plaintiff was sentenced for thirteen counts of rape, not the three he claims here.  By his argument, he would therefore have served seventy-nine years and five months under the 1987 standard, a time which, just as with the two hundred and thirty-four his calculations would indicate for the current standard, would appear to preclude parole at any point in his sentence.

In the second place, even in 1987 the average time served for thirteen rapes was not necessarily thirteen times the average time served for a single rape.  As Defendants point out, Plaintiff was not sentenced for a single crime, or even for a small group with one most prominent conviction.  He was sentenced for seventeen felonies, thirteen of which were rape upon child victims.  Plaintiff's circumstances are so unusual that it strains the powers of statistical analysis to identify comparable offenders and compare their parole rates before and after [changes in the law].  Defendants do not provide specific evidence to support their assertion that "[t]he astonishingly grotesque and inhumane facts and circumstances surrounding Plaintiff's convictions make him unlike any other Ohio inmate."  (Doc. 56 at 2.)  However, the Court can safely conclude that few enough inmates in the Ohio penal system are similarly situated to permit a meaningful statistical comparison[.]

(Doc. 65 at 10-11.)  Plaintiff's general premise is that, if he could only obtain more statistical data from Defendants, he could prove that he is now suffering under harsher parole standards than would have been applied to him in 1987.  This quest is futile.  Plaintiff cannot extrapolate from tables showing how long offenders typically serve for a single rape, or other similar data, a systematic guess at how Defendants would, in either 1987 or 2008, have evaluated an offender who committed Plaintiff's crimes, and certainly cannot do so simply by adding average sentences together.  He is, essentially because of the number and nature of the crimes for which he was sentenced, a statistical outlier unable to make such comparisons regardless of what further access to his parole file or more parole statistics would yield.  This methodology, whether or not it might be successful for a

12

different inmate, cannot show an *ex post facto* violation for Plaintiff.  *See Ridenour v. Collins*, 692 F.Supp.2d 827, 854 (S.D. Ohio 2010) (methodology not tailored to inmate's circumstances is not probative).

Plaintiff has two other arguments, which the Court need address only briefly. He argues that, in 1996, the Director of the Ohio Department of Rehabilitation and Correction submitted certain grant applications to the United States Department of Justice for funds under the "Violent Offender Incarceration and Truth-in-Sentencing" program.  (Doc. 69-2 at 1-6.) These applications, Plaintiff states, contained statutory assurances that Ohio had implemented or would implement truth-in-sentencing laws which would assure that violent offenders served a substantial portion of the sentences imposed.  Plaintiff asserts that these grant applications amount to binding contractual commitments by Defendants to retroactively subject Plaintiff to a longer term of incarceration than he otherwise would have served.  The Magistrate Judge, noting Defendant's argument that Plaintiff had been unable to indicate any Ohio statute or administrative code provision carrying out such an alleged contractual obligation, rejected this allegation as likewise not affecting the Parole Board's discretionary authority to grant or deny parole.  Plaintiff argues that, were he afforded additional discovery, he could prove that these alleged contractual obligations were applied to him. However, he has presented the Court with no specific, or even plausible, reason to think he might be able to do so, and has failed to establish a genuine issue of material fact that such statutory assurances have created a significant risk of

13

prolonging his punishment.

Finally, Plaintiff claims that various victims' rights statutes passed since the time of his sentencing and now implemented for all inmates facing parole hearings have a retroactive effect which create a significant risk of prolonging his incarceration. These statutes, amongst other things, generally required that at least one person on the Ohio Parole Board have been a victim of crime, a family member of such a victim, or have represented an organization advocating for victims' rights, and gave certain crime victims, their families, and their representatives certain rights to request, and be heard at, full parole board hearings.

He argues specifically that these new laws limit the discretion of the Parole Board by forcing it to consider victims' impact statements and by placing an actual victims' rights representative on the Board. The Court rejects this reasoning. Including victims of crime or their advocates on the parole board is not the same thing as removing the parole board's discretion as to what ultimate decision it will reach. As the court found in *Foster*, *supra*, a change in the composition of the parole board that results in the board's decision "within its discretion to get tougher" is not an *ex post facto* violation. This is the case even where the means by which it "got tougher" was to change its composition to include persons whose experience or perspectives might make them give greater weight in parole decisions to the nature of the inmate's offenses. Despite Plaintiff's claims that these changes to parole were not merely procedural, they do not ultimately affect the discretionary nature

14

of Ohio's parole system.  Providing the parole board additional factors to consider in

making its judgment – such as victims' statements – does not alter that discretion

either.

> Plaintiff raised one other argument:
>
> The R&R erroneously determined that O.R.C. §5149.101 does not
> change, or otherwise limit, parole board discretion.  The parole board
> has no discretion to ignore the provisions in O.R.C. §5149.101, in
> which the victims of crime or their representatives can stop the initial
> release on parole of an inmate.  Whether or not the parole board can
> ultimately parole the inmate after parole release has been initially
> stopped by the victims of crime or their representatives is not the
> issue.  The issue is whether the retroactive application of O.R.C.
> §5149.101 provisions to an inmate has a significant risk of increasing
> his period of incarceration.  However small the time-frame interval
> between the initial parole release date and the inmate's rehearing date
> by the parole board after a victim of crime or their representative has
> invoked their rights under O.R.C. §5149.101, amounts to an increased
> incarceration.

(Doc. 69 at 7-8.)  Plaintiff's characterization of the procedure established by

§5149.101 as permitting a victim's representative to stop the release of an inmate

granted parole is not accurate.  *Ridenour*, 692 F.Supp.2d at 837.  As this Court has

found before about §5149.101, "[n]otwithstanding the notice and hearing

requirement created by the statute, the Ohio Parole Board retains its full discretion

regarding its parole decisions."  *Clumm v. Warden, Chillicothe Corr. Inst.*, 2008 WL

4346797 at *3 (S.D. Ohio Sept. 18, 2008).

### D.   Conclusions

Judgment on Plaintiff's crimes was passed by the Court of Common Pleas of

Lucas County, and the Court does not address them here.  However, Plaintiff's

casuistic insistence that he was not really convicted of thirteen rapes (Doc. 47 at 5;

Doc. 52 at 5, 7; Doc. 69 at 4, 12) is mirrored by his disingenuous claims that the

Parole Board was compelled by legal mandates, hidden motives, or a general trend

towards tougher prisoner punishment to deny him a parole he should have already

received.  The record is totally devoid of any real basis for believing that the Parole

Board reached its decision for any reasons other than the ones it cited, or for

believing that arithmetic demonstrates that an inmate such as Plaintiff should

already have been paroled, but for new laws implemented with an *ex post facto*

effect.  The Court **ADOPTS** the July 27, 2010 Report and Recommendation of the

Magistrate Judge.  Defendants' motion for summary judgment (Doc. 65) is

**GRANTED**.  The Clerk of Court is **DIRECTED** to enter judgment for the

defendants and to close this case.

> **IT IS SO ORDERED.**

> /s/ *George C. Smith*
> **GEORGE C. SMITH, JUDGE**
> **UNITED STATES DISTRICT COURT**